IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: APPLICATION OF VICTOR )<br>ANDRES VARGAS SELMAN, PABLO )<br>PATRICIO GUTIERREZ FUENTES AND )<br>SANTORINI CAPITAL, LLC, FOR AN )<br>ORDER PURSUANT TO 28 U.S.C. § 1782 )<br>GRANTING LEAVE TO OBTAIN )<br>DISCOVERY FOR USE IN A FOREIGN )<br>PROCEEDING ) | Civil Action No. 23-895-CJB |

## MEMORANDUM ORDER

Presently pending before the Court is Petitioners Victor Andres Vargas Selman ("Vargas"), Pablo Patricio Gutierrez Fuentes ("Gutierrez") and Santorini Capital, LLC's ("Santorini") (collectively, "Petitioners") Application for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in a Foreign Proceeding ("Application"). (D.I. 1) With the Application, Petitioners ask the Court to order Merama Holdings LLC ("Merama Holdings") and Merama Inc. (together, "Respondents" or "Merama") to produce certain discovery for Petitioners' use in criminal proceedings presently pending in Chile. For the reasons set forth below, the Court HEREBY ORDERS that Petitioners' Motion is GRANTED in the manner set forth below.

**I.     BACKGROUND**

   **A.     Factual Background**

The Court will write here for the parties, who are well familiar with the facts and desire prompt resolution of the Application. Thus, the Court will forego a lengthy factual recitation here.

The Application relates to a dispute between the parties, which arose out of Respondents' investment in Congming Ltd. ("Congming"). Congming is a Hong Kong entity that operates in

Chile, and as of 2022 it was owned and operated by Vargas and Gutierrez.[1] (D.I. 10 at 2; D.I. 12 at ¶ 14(a)-(b))  On July 14, 2022, the parties entered into a Share Purchase Agreement ("SPA"); pursuant to the SPA, Merama Holdings, a Delaware entity,[2] acquired 55% of Congming from Petitioners.  (D.I. 3 at 1; D.I. 4 at ¶ 9(b); D.I. 12 at ¶ 14(g))  The parties' relationship fell apart soon after.

Ultimately, on May 2, 2023, Merama Holdings filed a criminal complaint against Vargas and Gutierrez in the criminal court of Santiago, Chile (the "Chilean Proceeding" or "the proceeding").  (D.I. 3 at 11; D.I. 4, ex. B)  The May 2, 2023 complaint charged Petitioners with fraud, forgery of corporate instruments, and criminal use of forged instruments in relation to the sale of Congming to Respondents.  (D.I. 3 at 11; D.I. 4 at 11-12 n.1)  On May 18, 2023, Merama Holdings filed a "second criminal complaint" against Petitioners for various crimes including fraud, misappropriation, unfair administration, forgery of private commercial instruments, and malicious use of false private commercial instruments.  (*Id.*; *see also* D.I. 12 at ¶¶ 10, 13)[3]

**B.    Procedural Background**

Petitioners filed the instant case on August 15, 2023.  (D.I. 1)  The case was referred to the Court to conduct all proceedings and determine all motions on September 19, 2023.  (D.I. 21)

---

[1]    Gutierrez held his interests in Congming through Santorini.  (D.I. 12 at ¶ 14(b), (h); D.I. 10 at 2)

[2]    The other Respondent, Merama Inc., is the parent company of Merama Holdings.  (D.I. 10 at 14)  It is also incorporated in Delaware.  (D.I. 4 at ¶ 8)

[3]    During oral argument, Respondents' counsel asserted that the first complaint "pertains to acts prior to the sale" of a portion of Congming, and that the second complaint "pertains to conduct after the sale."  (D.I. 31 at 37)

2

On October 23, 2023, the parties consented to the Court's jurisdiction to conduct all proceedings in this matter. (D.I. 29)

Briefing on the Application was completed September 13, 2023. (D.I. 15) The Court heard oral argument on the Application via videoconference on December 18, 2023. (D.I. 31 (hereafter "Tr."))

## II.  STANDARD OF REVIEW

Under 28 U.S.C. § 1782 ("Section 1782"), "[t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal. The order may be made . . . upon the application of any interested person[.]" 28 U.S.C. § 1782(a). The aim of the statute is to "facilitate the conduct of litigation in foreign tribunals, improve international cooperation in litigation, and put the United States into the leadership position among world nations in this respect." *In re Bayer AG*, 146 F.3d 188, 191-92 (3d Cir. 1998).

For a court to compel discovery sought under Section 1782, the applicant must first demonstrate that three statutory requirements are met: (1) the party from whom discovery is sought must reside in or be found in the district; (2) the discovery must be "for use in a proceeding before a foreign or international tribunal[;]" and (3) the application must be made, *inter alia*, by an "interested person." *See* 28 U.S.C. § 1782(a); *In re Ex Parte Application of Eni S.p.A. for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in Foreign Procs.*, No. 20-mc-334-MN, 2021 WL 1063390, at *2 (D. Del. Mar. 19, 2021); *see also In re Bayer*, 146 F.3d at 193. If a Court finds that the statutory factors have been met, then it has discretion to grant the application. *In re Application of Gilead Pharmasset LLC*, C.A. No. 14-mc-243 (GMS), 2015 WL 1903957, at *2 (D. Del. Apr. 14, 2015).

In determining how to exercise that discretion, courts look to four factors set forth by the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004):  (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding[;]" (2) "the nature of the foreign tribunal, the character of the foreign proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance[;]" (3) whether the "request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States[;]" and (4) whether the request is "unduly intrusive or burdensome[.]"  542 U.S. at 264-65; *see also Eni S.p.A.*, 2021 WL 1063390, at *2.  These are known as the *Intel* factors.  The party opposing discovery (here, Respondents), has the burden of proof at this stage to demonstrate offense to the foreign jurisdiction, or any other facts warranting denial of the Application.  *In re Chevron Corp.*, 633 F.3d 153, 162 (3d Cir. 2011).

## III.  DISCUSSION

With their Application, Petitioners seek production of certain documents from Respondents to use in the Chilean Proceeding.  (*See generally* D.I. 1 & ex. 1)  To that end, Petitioners served on Respondents a subpoena requesting documents relating to 33 different categories of information.  (D.I. 1, ex. 1 ("Subpoena") at 8-12)[4]  For their part, Respondents

---

[4] Petitioners also seek deposition testimony from Respondents.  (D.I. 1 at 1; D.I. 3 at 11)  In their briefing, Respondents did not make a separate or distinct argument about why deposition testimony would be unwarranted here; instead, their arguments as to why the Application should be denied were simply those described in this opinion—arguments that were focused on Petitioners' request for documents and why those requests were not well supported.  (D.I. 10; Tr. at 49)  Nevertheless, during oral argument, at one point Respondents' counsel seemed to make a new argument for denial of the Application—one that was specific to the issue of deposition testimony.  (Tr. at 48-49)  A party may not make new arguments during oral argument that are not made in the briefs; such an argument has been waived or forfeited.  *See Horatio Washington Depot Techs. LLC v. TOLMAR, Inc.*, Civil Action No. 17-1086-LPS, 2018

argue that the Application should be denied in its entirety. (D.I. 10) In doing so, Respondents first assert that Petitioners have not met one of the three statutory requirements—the second "for use" requirement. (*Id*. at 10-12) Additionally, even were that requirement to have been met, Respondents argue that application of the *Intel* factors indicates that the Application should be denied. (*Id*. at 12-20) The Court will address these arguments in turn.

### A.  The "For Use" Statutory Requirement

As was noted above, Respondents do not challenge that the first and third statutory requirements are met here, but they do argue that the second "for use" requirement has not been satisfied. In order to demonstrate that the material at issue will be "for use" in the foreign proceeding, a petitioner must meet only a "low threshold"—that is, it must simply demonstrate that "'the evidence sought is something that will be employed with some advantage or serve some use in the proceeding.'" *Eni S.p.A.*, 2021 WL 1063390, at *3 (quoting *Certain Funds, Accts. and/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 120 (2d Cir. 2015)). "The key question, therefore, is not simply whether the information sought is relevant, but whether the [petitioner] will actually be able to use the information in the [foreign] proceeding." *Certain Funds*, 798 F.3d at 120.

Respondents assert that the documents Petitioners seek are "largely irrelevant" to the Chilean Proceeding and thus are not "for use" in that proceeding—in that they would not provide a defense or advance Petitioners' interests. (D.I. 10 at 10, 18; Tr. at 34-40, 52) In order to better

---

WL 5669168, at *7 n.4 (D. Del. Nov. 1, 2018), *report and recommendation adopted* 2019 WL 1276028 (D. Del. Mar. 20, 2019). Accordingly, herein the Court will address only the arguments that were made in the parties' briefs, which largely, if not exclusively, focused on the substance of the document requests found in the Subpoena.

explain Respondents' position, the Court needs to first take a step back and set out what it knows about the Chilean Proceeding.

Unfortunately, Petitioners made this task much more difficult than it had to be. That is because they provided the Court with little information about the substance of the Chilean Proceeding, beyond attaching untranslated copies of the operative complaint filed therein. (D.I. 4, ex. B; *see also* D.I. 3 at 13; D.I. 10 at 18; Tr. at 10-11) Since the Court does not speak Spanish, this filing was not of much use to it. Indeed, the only usable information the Court has explaining the allegations in the Chilean Proceeding (e.g., so that the Court can compare the substance of those allegations with the content of the document requests found in Petitioners' Subpoena) comes from Respondents. (*See* D.I. 12)

Respondents explain that their allegations in the Chilean Proceeding are focused on certain particular misrepresentations that Petitioners made to them regarding the SPA. (D.I. 12 at ¶¶ 13-14; Tr. at 37) More specifically:

- Respondents note that Petitioners and Respondents had agreed that Congming's valuation was to be determined on the basis of future cash flows; as a result, prior to the acquisition, Respondents were interested in gaining information about Congming's account receivables (which would be an indicator of both its current sales volume and future sales). (D.I. 12 at ¶ 14(d)) Petitioners purportedly disclosed that over 60% of the account receivables owed to Congming were owed by Smart Trade SpA ("Smart Trade"), a Chilean entity; they represented that Smart Trade was not a related entity to Congming. (*Id*. at ¶ 14(e)-(f)) However, Respondents say that after the acquisition, they discovered that Smart Trade was in fact a related entity to Congming, and that many of the outstanding invoices that had been sent to Smart Trade appeared to be inauthentic; this all suggested that Respondents' pre-acquisition valuation of Congming was faulty, due to Petitioners' misrepresentations. (*Id*. at ¶ 14(j)-(l))

- Additionally, Respondents allege that Petitioners made misrepresentations regarding their business dealings with a Delaware entity known as Lotus Mobility LLC ("Lotus"). (*Id.* at ¶ 14(m)-(v))  After the parties signed the SPA, Petitioners remained in control of Congming's management. (*Id.* at ¶ 14(m))  In late 2022, Petitioners allegedly requested credit from Respondents to enable them to fund business opportunities, including an opportunity to purchase scooters from Lotus, which would later be re-sold. (*Id.* at ¶ 14(o))  A related entity to Respondents provided Congming with an approximately $5 million loan for this opportunity. (*Id.* at ¶ 14(n))  Lotus subsequently sent invoices to Congming for these sales, and Congming paid the invoices. (*Id.* at ¶ 14(p))  But Respondents allege that they later learned that the scooters were purchased for prices that were much higher than their retail price. (*Id.* at ¶ 14(q))  And they learned that: (1) Lotus had only been incorporated around the time the scooter opportunity arose; and (2) in an attempt to hide this fact, Lotus had provided Congming with fraudulent documentation falsely indicating that Lotus had been incorporated back in 2020. (*Id.* at ¶ 14(r))  Respondents also allegedly uncovered evidence that Lotus had provided false bank account information, which made it wrongly seem as if the entity existed prior to 2022. (*Id.* at ¶ 14(s))  Lastly, Respondents assert that, like Smart Trade, Lotus was actually a related entity to Petitioners (and that Petitioners purposely concealed this fact). (*Id.* at ¶ 14(t)-(u))

According to Respondents, then, the Chilean Proceeding is all about Petitioners' actions with regard to Smart Trade and Lotus. And since Respondents were the only party to put understandable information in the record about the subject matter of that proceeding, the Court must accept these assertions as accurate for purposes of this opinion. (Tr. at 52-53 (Respondents' counsel noting that Respondents' declaration from their Chilean counsel, explaining the substance of the Chilean Proceeding, "is the closest you have to what those criminal complaints actually say"))[5]

---

[5]  For their part, Petitioners have a different view of what the Chilean Proceeding is about. In their view, the proceeding is about a scheme by Respondents to induce Petitioners to sign the SPA under false pretenses, so that Respondents could effectively take over Congming.

From there though, Respondents seem to argue that since the Chilean Proceeding is focused on fraud related to Smart Trade and Lotus, then only documents that specifically reference or mention Smart Trade or Louts could be relevant to that proceeding. (Tr. at 37-42) Even if that narrow view was accurate, Petitioners' document requests would still surely implicate some relevant and potentially usable material. For example, Petitioners' (overly broad) requests number 1 and 2 are requests for "[a]ll Communications between Petitioners and [Respondents] and all Documents concerning or recording such Communications" and "[a]ll Documents, including Communications internal to [Respondents] or with any other Person, concerning Petitioners[,]" respectively. (Subpoena at 8) And (also overly broad) request number 16 seeks "[a]ll Documents, including Communications internal to [Respondents] or with any other Person, relating to any Congming client." (*Id*. at 10) Thus, even if only information directly referencing Congming's involvement with Smart Trade and Lotus was "for use" in the Chilean Proceeding, it seems likely that these document requests (and some others listed in the Subpoena) would capture such information. (D.I. 16 at ¶ 18; Tr. at 13-14, 33-35, 38-39)

Moreover, the Court does not agree with Respondents' overly cabined view about what documents may be "for use" in the Chilean Proceeding. It does not make sense that *only* those documents that specifically reference Smart Trade or Lotus would be usable in Petitioners' defense of the criminal matter. (Tr. at 35-36) By way of example, there can be no doubt that multiple of Petitioners' document requests would call for production of the SPA itself. (*Id*. at

---

(D.I. 3 at 2; Tr. at 13-15) Petitioners say that information relevant to these subjects will include "the identities and roles of Merama's directors, the intended and actual creation and operation of Merama's line of credit for Congming, and Merama's use of promissory notes." (D.I. 3 at 2) Again though, Petitioners did not provide any usable record evidence that would substantiate what is the subject matter of the Chilean Proceeding. And the Court cannot rely on attorney argument to fill in those blanks.

8

39-40)  While that document does not specifically reference Smart Trade or Lotus, it surely is *relevant to* and *might be able to be used* by Petitioners in the Chilean Proceeding (since the SPA's execution is what prompted the parties' discussions about Smart Trade and Lotus in the first place). (*Id.* at 36, 40)  Additionally, there are likely other responsive documents that would provide basic substantive background about the SPA transaction and the negotiations leading thereto (which, in turn, prompted Petitioners' allegedly fraudulent assertions regarding Smart Trade and Lotus).  No doubt some of these documents would also be "for use." (*See* D.I. 3 at 1-2; D.I. 15 at 4-5; Tr. at 9-16)

With all of that said, surely there are limits.  Petitioners seem to take the view that almost *any* document that has *any* connection to the relationship between Petitioners and Respondents could be "for use" in the Chilean Proceeding.  This is purportedly because any such document might help "lay[] out the circumstances and . . . help[] support the whole backdrop of this story, [which is] that this really was a setup from the beginning [and that Respondents are] making these allegations [in the Chilean Proceeding] because of the underlying fraud *that they're* perpetrating on [Congming]." (Tr. at 15 (emphasis added))  To the Court, this type of argument seems a bridge too far.

By way of example, in their briefing and submissions, Petitioners explain their contention that Respondents have breached a June 14, 2022 Shareholder's Agreement ("SHA") between the parties in various respects, including SHA provisions regarding a line of credit.  And they assert that some of the Subpoena's document requests are meant to seek more information about this breach of contract claim. (D.I. 4 at ¶ 9; *see also* D.I. 3 at 5-10; Subpoena at 10 (request number 17))  Yet absent a better explanation than the one provided in Petitioners' submissions, the Court does not understand how documents about a claim that *Respondents breached a contract with*

9

*Petitioners* would be sufficiently relevant to claims that *Petitioners committed fraud against Respondents* having to do with Smart Trade and Lotus.[6] (D.I. 10 at 11; D.I. 12 at ¶¶ 31-33; Tr. at 34-39)

In sum, at least some of the information Petitioners seek is surely relevant and "for use" in the Chilean Proceeding. Therefore, and in light of the *de minimis* burden that Petitioners face in showing that this requirement is met, the Court cannot deny the Application on this ground. *See, e.g., Mussington v. Deborah Brosnan & Assocs., LLC*, Case No. 23-mc-00093 (TSC/GMH), 2023 WL 9112442, at *8 (D.D.C. Dec. 22, 2023) (noting that the applicants faced only a "*de minimis* burden" in showing that the requested documents were "for use" in a foreign proceeding, and explaining that although it was "not clear" how the documents "would inform directly" on the applicants' arguments in the proceeding, the applicants had met this burden where it seemed "plausible" that the documents could be "helpful to provide context" for their relevant actions); *In re B&C KB Holding GmbH*, 22-mc-00180 (LAK) (VF), 2023 WL 1777326, at *5 (S.D.N.Y. Feb. 6, 2023) (explaining that a petitioner need only make a "*de minimis* showing that the information sought is 'for use'" in a foreign proceeding, finding that this burden was satisfied where the petitioners' foreign counsel submitted declarations detailing the relevancy of the requested information to the proceeding, and rejecting the respondents'

---

[6] In addition to the Chilean Proceeding, there is a currently-pending arbitration proceeding in Chile brought by Merama Holdings against Petitioners, as well as a Hong Kong-based arbitration proceeding brought by certain Petitioners against Merama Holdings. (D.I. 10 at 1, 11; D.I. 17 at 1) Respondents argue that the real reason that Petitioners are seeking many, if not all, of the documents at issue here is because they wish to use them in these arbitration proceedings—not in the Chilean Proceeding. (D.I. 10 at 11; D.I. 17 at 1; Tr. at 32, 52) If true, this would be problematic, since information that is only relevant to the arbitration proceedings could not properly be requested via this Application. That is because arbitrations are not considered a "foreign or international tribunal" pursuant to Section 1782. *See Z.F. Auto. US, Inc. v. Luxshare, Ltd.*, 596 U.S. 619, 632, 638 (2022).

argument that the information sought was not "for use" due to the overbreadth of the requests, because any "'alleged overbreadth of the Subpoenas' is an objection that 'speaks to the extent of the discovery that should be granted, not whether the statutory 'for use' requirement has been met'") (citation omitted). While some amount of the current document requests will need to be narrowed, Petitioners have at least made the necessary showing as to this requirement.[7]

### B.  *Intel* Factors

Having concluded that Petitioners satisfied the statutory factors, the Court will now address the parties' arguments regarding the discretionary *Intel* factors. In the end, the Court concludes that although the factors do not all go one way, they support granting the Application, particularly if the scope of Petitioners' requests are reduced (as they will be).

#### 1.  *Intel* Factor 1

The first *Intel* factor considers whether "the person from whom discovery is sought is a participant in the foreign proceeding[.]" *Intel Corp.*, 542 U.S. at 264. When this is the case, "the need for [Section] 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Id*. This is because "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence." *Id*. Here, it is undisputed that Merama Holdings is a party to the Chilean Proceeding, while Merama Inc. is not. (D.I. 3 at 1)

With regard to Merama Inc.'s status, although it is a non-party, Respondents have provided a declaration from their Chilean counsel stating that the prosecutor in a Chilean

---

[7] The parties can further meet and confer in an attempt to reach agreement on narrowed document requests. If the parties cannot agree on the proper scope of certain requests, the Court will no doubt have to make further judgment calls about what portion of the sought-after discovery is relevant, and what is not.

criminal proceeding may, in certain circumstances, obtain relevant documents from a non-party (including after a defendant requests that the prosecutor do so). (D.I. 12 at ¶¶ 16, 21, 23-24) Respondents argue that in light of this, and because Merama Holdings *is* a party to the proceeding, the first *Intel* factor weighs against Petitioners. (D.I. 10 at 13-15) Further, Respondents explain that they have every incentive to produce documents or witness testimony in the Chilean Proceeding if the prosecutor requests that they do so. For one thing, they note that if they failed to respond to the Chilean prosecutor's order in this regard, the prosecutor could enlist the aid of a Chilean court to obtain the documents or to impose a fine on them. (D.I. 12 at ¶ 27; D.I. 4 at ¶ 25 & n.12; Tr. at 23) They also explain that disregard of the Chilean prosecutor's request would be self-defeating, in that the prosecutor—who has the discretion to drop the investigation and effectively end the criminal proceeding—might well do so if Respondents failed to cooperate. (D.I. 12 at ¶¶ 27-28; D.I. 10 at 1-2, 8; Tr. at 24-26, 45, 49-50)

In response, Petitioners argue—also citing to a declaration from their Chilean counsel—that while in theory a Chilean prosecutor might be able to obtain some evidence from a party or a non-party like Respondents in a criminal proceeding, in reality this is unlikely to occur. (D.I. 16 at ¶¶ 10-13; Tr. at 21-25) For example, Petitioners note that although a Chilean prosecutor can request documents from a party or non-party, at the early stages of a criminal case a prosecutor is typically more concerned with obtaining more easily-available evidence. (D.I. 3 at 17; D.I. 16 at ¶ 11)[8] Petitioners further explain that if a prosecutor actually wanted to try to compel a foreign

---

[8]  Petitioners also asserted that Chilean courts "have neither the legal basis nor coercive power to enforce their orders over companies located out of Chile that refuse to comply with evidentiary requests." (D.I. 16 at ¶ 14) In support of this argument, Petitioners cite to language in Chile's Criminal Code that purportedly states: "Chilean criminal law is mandatory for all inhabitants of the Republic, including foreigners. Crimes committed within the territorial or adjacent sea are subject to the prescriptions of this Code[.]" (*Id.* (emphasis omitted))

entity to turn over documents that are located internationally, it would have to seek help from the International Cooperation and Extraditions Unit ("ICEU"); they assert that this is a long and costly process, which prosecutors would only utilize in exceptional circumstances. (D.I. 16 at ¶ 11; Tr. at 22) And Petitioners also note that in Chile there is a large volume of criminal investigations involving alleged financial fraud; as a result, insufficient resources are allocated to such investigations, further limiting prosecutors' ability to collect relevant documents. (*Id*. at ¶ 12) In light of all of this, Petitioners believe the only realistic way for them to obtain the information they seek is through this Application. (*Id*. at ¶¶ 12-13; Tr. at 22-25)[9]

In the end, both sides' arguments and evidence as to this factor have some merit. Based on the showing by Petitioners, it does appear that there are a number of practical barriers to the Chilean prosecutor obtaining documents or testimony from a party or a non-party to a Chilean criminal proceeding, either voluntarily or otherwise. And yet it appears that obtaining such information is at least a *possibility* in that proceeding. And Respondents made a credible argument that were such information requested of them by the prosecutor, it would only be in their interest to cooperate. In light of this mixed record, and with one of the Respondents

---

However, this language does not necessarily support Petitioners' argument, in that it does not specifically state that prosecutors in Chile are unable to force foreign entities to comply with evidentiary requests. If anything, the language indicates that prosecutors *do* have some power to enforce the Criminal Code as to foreign companies.

[9]     In their opening brief, Petitioners cited to evidence and made arguments about how difficult it is in Chile to obtain evidence by way of obtaining preliminary injunctions. (D.I. 3 at 17; D.I. 4 at ¶¶ 23-25) However, Respondents persuasively argued that the preliminary injunction-related rules that Petitioners were citing to relate to civil cases—and that they were not really applicable to a criminal proceeding like the one at issue here. (D.I. 10 at 14; D.I. 12 at ¶ 21 & n.2; Tr. at 44, 51) Petitioners did not respond to this argument, or explain why it was incorrect. In light of this, the Court will not consider Petitioners' citations to preliminary injunction-practice in Chile.

(Merama Holdings) actually being a party to the Chilean Proceeding, the Court concludes that Respondents have demonstrated that the first *Intel* factor at least slightly favors their position. *See In re Bouka*, 654 F. Supp. 3d 283, 290 (S.D.N.Y. 2023) ("Because the [foreign] court has jurisdiction over [petitioner], this factor weighs against granting discovery."); *cf. Via Vadis Controlling GmbH v. Skype, Inc.*, No. Civ.A. 12-MC-193-RGA, 2013 WL 646236, at *2 (D. Del. Feb. 21, 2013) (concluding that the first factor favored the respondents, where at least one of five respondents was a participant in the foreign proceeding).

### 2. *Intel* Factor 2

The second *Intel* factor considers "the nature of the foreign tribunal, the character of the foreign proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Intel Corp.*, 542 U.S. at 264. The relevant inquiry here is "whether the foreign court would consider the evidence revealed from a [Section] 1782 order." *Via Vadis*, 2013 WL 646236, at *2.

Here, it is undisputed that Chilean courts would consider at least some of the evidence that Petitioners seek. (D.I. 3 at 18; D.I. 10 at 15; *see also* D.I. 4 at ¶ 29 (Petitioners' Chilean counsel noting that "Chilean tribunals are receptive to judicial assistance from U[.]S[.] courts so long as the evidence is obtained through legal means and is probative of issues in the Chilean proceedings.")) This obviously helps Petitioners. *Via Vadis*, 2013 WL 646236, at *2.

Despite this, Respondents argue that the factor weighs in their favor. They say this is so because Petitioners have not even attempted to obtain the documents at issue in Chile via a request to the Chilean prosecutor—and so by seeking discovery through this Application, Petitioners are purportedly "disrespect[ing] the authorities in the Chilean Proceeding[.]" (D.I. 10 at 15-16; *see also* Tr. at 43-44)

14

However, as will be explained in further detail in the next subsection, a Section 1782 petitioner is not required to exhaust all other administrative or legal remedies before bringing an application such as this one. And as previously noted, Petitioners credibly assert that even had they made a request to the Chilean prosecutor for the information at issue, it was unlikely that such a request would pay off (at least in the near term).

In light of all of this, the Court has no basis to conclude that the Chilean prosecutor or the Chilean court system would be offended by Petitioners' Application here. Nor can it conclude that a Chilean court would refuse to consider any relevant information obtained via the Section 1782 process. Therefore, this second *Intel* factor weighs in favor of Petitioners. *Cf. In re Application of Silvia Gianoli Aldunate*, 3 F.3d 54, 62 (3d Cir. 1993) (applying this factor as to a Chilean civil proceeding, and noting that because litigants in Chile are not prohibited from gathering evidence through methods that are lawful in the place where they are undertaken, a grant of discovery under Section 1782 would not be an affront to a Chilean court); *In re B&C KB Holding GmbH*, 2023 WL 1777326, at *6-7 (concluding that this factor weighed in favor of the petitioner, where there was evidence that the foreign courts at issue would be receptive to the Section 1782 assistance, and noting that there was no requirement that a petitioner first wait for foreign prosecutors to seek out the evidence at issue before resorting to a Section 1782 request); *In re Martin & Harris Priv. Ltd.*, Civil Action No. 20-17070 (MCA) (MAH), 2021 WL 2434069, at *6-7 (D.N.J. June 14, 2021) (concluding the same, where the respondent failed to provide evidence that the foreign tribunal would reject the discovery sought, and where the discovery sought was relevant).

    3.    ***Intel* Factor 3**

The third *Intel* factor considers whether the "request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies[.]" *Intel Corp.*, 542 U.S. at 265. For this factor to weigh in favor of the applicant, it is not required "to [have] exhaust[ed] all potential discovery procedures in the foreign proceedings in order to obtain a federal court's assistance under [Section 1782]." *Gilead Pharmasset*, 2015 WL 1903957, at *4. Yet, "a perception that an applicant has 'side-stepped' less-than-favorable discovery rules by resorting immediately to [Section] 1782 can be a factor in a court's analysis." *Id*. (internal quotation marks and citation omitted).

Here, again Respondents argue that there are many ways for Petitioners to get these documents via the Chilean prosecutor or in the Chilean Proceeding, and that Petitioners are seeking to "circumvent" those procedures by filing the Application. (D.I. 10 at 17; Tr. at 46-48, 56) Respondents recognize that Petitioners are not required to exhaust the remedies available to them in Chile, but they point to case law indicating that, as to this factor, courts sometimes consider whether a party has first attempted to seek information in the foreign jurisdiction. (D.I. 10 at 16; Tr. at 44-45); *see Gilead Pharmasset LLC*, 2015 WL 1903957, at *4; *In re Application for Discovery for Use in Foreign Proc. Pursuant to 28 U.S.C. § 1782*, Civ. No. 17-4269-KM-JBC, 2019 WL 168828, at *12 (D.N.J. Jan. 10, 2019) (determining that the third *Intel* factor favored the respondents, because the petitioners filed a Section 1782 application before seeking discovery in the foreign forum, and where there was no evidence that the petitioners would have been unable to obtain the necessary discovery in the foreign forum).

To be sure, Petitioners have made no efforts to obtain the information at issue in the Chilean Proceeding. But as noted above, the record does plausibly explain *why* this is so—i.e., that such efforts might well be futile, or at least might take many months or years to bear fruit.

Moreover, this is not a case where the foreign court has some type of clear rule barring Petitioners from obtaining the type of discovery at issue—such that it appears that Petitioners are seeking to get around such a rule by using U.S.-based discovery procedures. *See In re Bayer*, 146 F.3d at 195 ("The comity concerns we expressed against use of U.S. discovery procedures to evade the limitations placed on domestic pre-trial disclosure by foreign tribunals . . . are applicable only when the substance of the discovery is objectionable.") (internal quotation marks and citations omitted); *In re Syngenta Crop Prot. AG*, MSC No. 21-mc-375-CFC, 2022 WL 1690832, at *2 (D. Del. May 26, 2022). And this is not a scenario where a foreign court has already determined that the type of evidence at issue is irrelevant or otherwise inadmissible. *See In re JSC United Chem. Co. Uralchem*, Civ. A. No. 20-3651 (CCC), 2020 WL 4251476, at *5, 8 (D.N.J. July 24, 2020) (concluding that where the foreign tribunal had already determined that the documents the petitioner sought were not relevant to the proceeding, pursuing similar documents through a Section 1782 application "could be construed to be a circumvention of prior judicial decision-making . . . ").

In light of the above, Respondents have not met their burden to show that Petitioners' actions here amount to an attempt to "circumvent" Chilean proof-gathering restrictions or other policies. Thus, this factor also favors Petitioners.

    **4.**    *Intel* **Factor 4**

The fourth *Intel* factor considers whether the request is "unduly intrusive or burdensome[.]" *Intel Corp.*, 542 U.S. at 265. "[A]ssessment of the fourth factor is virtually identical to the familiar 'overly burdensome' analysis that is integral to the Federal Rules[,]" as "Section 1782 expressly incorporates the Federal Rules of Civil Procedure and the fourth [*Intel*] factor aligns with Rules 26 and 45." *In re ex parte Glob. Energy Horizons Corp.*, 647 Fed.

App'x 83, 85-86 (3d Cir. 2016).  In assessing this factor, the Court asks whether, as in a Rule 26 inquiry, the discovery requested is relevant to any party's claim or defense and proportional to the needs of the case.  *See In re Sevier*, C.A. No. 22-mc-80-RGA-SRF, 2022 WL 3923679, at *3 (D. Del. Aug. 31, 2022).

As with their "for use" argument above, here Respondents assert that the requests are "largely irrelevant[.]"  (D.I. 10 at 18; *see also* Tr. at 35)  They contend that the requests should be focused on Smart Trade and Lotus, instead of on Respondents' "purported pressure to expand in new markets, breaches of the SHA, [] decision to control Congming[]" or other ancillary topics referenced in the Subpoena.  (D.I. 10 at 18; *see also* Tr. at 38-39)

For previously-discussed reasons, the Court agrees with Respondents that Petitioners' requests are surely overbroad.  For example, many of Petitioners' document requests ask for production of "all documents" or "all communications" of a certain type.  (Subpoena at 8-12)  These are not narrowly tailored requests.  *See Associacão dos Profissionais dos Correios v. Bank of N.Y Melon Corp.*, 22-MC-0132 (RA) (KHP), 2022 WL 4955312, at *8 (S.D.N.Y. Oct. 4, 2022) ("Requests for 'all' documents are inherently overbroad unless the 'all' refers to a very discrete set of documents[.]").  On the other hand, as the Court has also noted above, Petitioners have explained why at least a core amount of the requested documents and information are certainly relevant to the Chilean Proceeding.  And that core is likely larger than what Respondents think it is.

In the Court's view then, this factor is about neutral.  Moreover, the Court notes that although it is not required to do so, *see Glob. Energy Horizons*, 647 Fed. App'x at 87, it may trim requests like these so that they are more tailored in scope, *see Intel Corp.*, 542 U.S. at 265; *see also* (Tr. at 18-21).  As the Court noted above, *see infra* at n.7, it intends to address that issue

in the future, if the parties cannot otherwise agree on an appropriately reduced scope for the document requests at issue.

IV.  **CONCLUSION**

For the reasons set forth above, Petitioners met the statutory requirements with regard to the instant Application.  This allows the Court the discretion to grant the Application if it sees fit.  From there, the *Intel* factors were not one-sided.  Two of those factors supported Petitioners' position, one at least slightly supported Respondents' position, and one was about neutral.  With more of the factors going Petitioners' way, and with some amount of the discovery sought likely to be relevant and usable in the Chilean Proceeding, the Court will GRANT the Application as follows:  (1) The Application is GRANTED to the extent it calls for documents and information bearing directly on Congming's relationship to Smart Trade and Lotus (i.e., documents or questions specifically referencing those subjects).; and (2) As to other categories of documents or information called for by the Application, the parties should use the guidance provided herein and further meet and confer in an attempt to reach agreement on the scope of the remaining requests by no later than **March 27, 2024**.  By that date, the parties should provide the Court with a joint letter, of no more than five single-spaced pages, summarizing their efforts and the nature of any remaining disputed issues.

Dated: March 13, 2024

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

19